PEOPLE *v.* McCORMACK *et al.*

*(Supreme Court, General Term, First Department.* June 3, 1892.)

HOMICIDE—MANSLAUGHTER—EVIDENCE.

A conviction of manslaughter will be affirmed on appeal, where, on an examination of the evidence and the salient features of the case, but one conclusion can be arrived at, which is that deceased was shot by either defendant or M. or J., and that from the position which the three occupied to deceased, and the position and direction of the bullet wound, the shot must have come from defendant.

Appeal from court of general sessions, New York county.

Frank McCormack, impleaded with John Feely and Martin Feely, was convicted of manslaughter in the first degree, and appeals. Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and BARRETT, JJ.

S. *Miller,* for appellant. *De Lancey Nicoll,* (*H. B. B. Stapler,* of counsel,) for the People.

VAN BRUNT, P. J. The defendant was indicted in February, 1891, jointly with John and Martin Feely, charged with the crime of murder in the first degree, in the killing on the 22d of November, 1890, at the city of New York, of one Edward Gillespie, by shooting him with a pistol. The defendant pleaded not guilty, and after a trial the jury found him guilty of manslaughter in the first degree, and from the judgment thereupon entered this appeal is taken.

The claim urged upon the part of the appellant is that there was not sufficient evidence to justify the conviction of the defendant of the crime charged against him, and that the killing was done by another person, whose identity it has not been possible to establish. The claim made upon the part of the people was that the defendant, John Feely, Martin Feely, and the deceased had been together for some little time prior to the hour when Gillespie was shot. Shortly before the shot was fired, the Feelys, the defendant, and the deceased were standing near the southeasterly corner of Thirty-Eighth street and Second avenue, the defendant in front of the deceased, and talking in a loud voice. Immediately after the shot was fired, the parties were standing in the same position, and the deceased fell, being shot in the center of the forehead, about an inch and a half above the eyebrows, the direction of the bullet being straight backwards. The other three men then went to the corner. One of them, a tall man, went up towards Thirty-Ninth street, and the other two down Second avenue towards Thirty-Seventh street. A passer-by having been attracted by the flash and the hearing of the pistol shot came up, saw an object lying on the sidewalk, found it to be the body of the deceased, and saw that he had been shot. When he discovered this, he raised the cry of "Murder! Stop, thief!" Immediately upon this, the two men who had gone down Second avenue, and were proceeding at an ordinary walk, broke into a run. When about 50 feet from Thirty-Seventh street, the one next to Thirty-Seventh street, which was the defendant, was grabbed by Officer Schneider, of the twenty-first precinct, and the other man, who was running about 10 feet behind him, was John Feely. Prior to this time neither the defendant nor John Feely had made any outcry whatever. Immediately after his arrest the defendant pointed across the street to a man walking leisurely along Thirty-Seventh street, who he said had shot a man on Thirty-Eighth street. When the officer was about to arrest him, he said he was not the man, but that the man had gone into a saloon at the corner of Second avenue and Thirty-Seventh street; and when the officer went into the saloon the proprietor said he had not seen a man come in for 20 minutes. When they came out the defendant claimed that a man who was seen by himself and the officer in Thirty-Seventh street near Third avenue was the man who did the shooting. On coming to this man the defendant at first stated that he did not know

whether he was the man or not, but finally stated he was not the man. The officer then said to the defendant, "I think you have been fooling me, and giving me a wild goose chase." To the best of his belief, the officer said the defendant made no answer to this. Other witnesses examined upon the part of the prosecution hearing the pistol shot, and attracted thereby, went to the respective windows of their rooms, saw four men in the street, one man fall, and one man go up Second avenue and two down.

It was claimed by the people that from the position of the parties, although no witness saw the shot fired, or the pistol from which the shot came, it must have come from the defendant, McCormack. There was some evidence tending to show that McCormack and Gillespie had had some words, and that the defendant had a pistol, and had drawn it upon a previous occasion. Upon the part of the defendant it was conceded that John Feely, the defendant, and Gillespie were standing together just prior to the shooting. It was admitted that Martin Feely had been with the others during the evening, but it was claimed that they, together with one Michael Mahoney, were in a barber shop together, and that Martin Feely complained of being sick; that the five boys left the barber shop together, and went around to 310 East Thirty-Ninth street, where the Feely boys resided with their parents; and that Martin went upstairs into the house, and did not come out again that night. After standing at the door a few moments, John Feely, the defendant, and the deceased went up Thirty-Ninth street, towards Second avenue, and just then one Wellington, another young friend, came up, and remained at the door of No. 310 with Mahoney while the three others proceeded to the corner of Second avenue, and then down Second avenue. As they were turning the northeast corner of Thirty-Eighth street and Second avenue, a tall man with a light overcoat was standing there with his back towards them, and looking down Second avenue, and, turning slightly round, he called out, "Who are you looking at?" The three still kept on their walk towards the northerly side of Thirty-Eighth street, when the tall man said again, "Who are you looking at?" Thereupon Gillespie turned back, and the other two kept going down to Thirty-Eighth street, towards Healey's saloon. After advancing a few steps, they looked around, and saw Gillespie and the tall man about an arm's length apart, and in an attitude as if about to strike; while just at that moment another man, shorter and stouter than the one who stood on the corner, and apparently having come across the street, stepped up on the sidewalk near Gillespie, attracted Gillespie's attention, and, placing himself between Gillespie and the other man, raised his hand. Just then the other man said, "Don't." Instantly there was a shot. Gillespie fell upon the sidewalk. The two strangers fled. The short, stout man, who did the shooting, ran up Second avenue, and down the south side of Thirty-Ninth street, towards First avenue, and the other man crossed diagonally to the southwest corner of Second avenue and Thirty-Eighth street, and down the west side of Second avenue towards Thirty-Seventh street. The defendant and Feely went to the body of Gillespie, and then to the corner, and down Second avenue, on the east side, in pursuit of the tall man, who was then in sight on the opposite side of the avenue, and before they could arouse a policeman he had escaped.

It is urged upon the part of the appellant that it is manifest that the testimony of some of the witnesses upon the part of the people cannot be true. But we think that a very brief examination of some of the prominent features of the case will show that the jury were not mistaken in the conclusion at which they arrived. In the first place, it was apparent that it was considered of the most vital importance to show that Martin Feely was at home at the time of the shooting. All the witnesses to prove the *alibi* looked at the clock for the purpose of ascertaining the time when Martin came home on the night in question, and they state that it was from 15 to 25 minutes past

11, while the shooting took place at about a quarter before 12, and that he did not go out again that night. In this there is harmony in the testimony of Martin Feely and the other witnesses to the *alibi*. But both Martin Feely and the other witnesses who were present when he went in contradict themselves in respect to a circumstance which would be much more apt to impress itself upon their minds than the exact time when Martin Feely came in on that occasion. Martin Feely says: "I went in and sat down for a few moments, and I got sick, and retired into the front room, and went to bed a short time after I went up, probably 25 minutes or half past eleven,—somewhere around that; I didn't take notice of the time. I didn't hear anything before I went to bed. I didn't see my brother again that night. I heard the shot that night, but I don't recollect the time. I was sick in the house, sitting up in the kitchen with these people. I could not exactly tell where it came from." It will thus be seen that Martin Feely goes to bed before the shot is fired, and yet he is sitting up in the kitchen with these people when he hears it. Another witness named Conway states that Martin Feely came in between 20 and 25 minutes past 11; that he stayed there probably about 15 or 20 minutes, when, apparently to the witness, he went into the room and went to bed. The witness heard a kind of a noise like a pistol shot, a firecracker, or something of that kind; and the witness further states that he did not know where Martin was when he heard the noise; that he had gone towards the room, and he supposed he went to bed. Mr. Dunn, another witness, testified that he looked at the clock when Martin came in, and that it was 20 to 25 minutes past 11; that Martin stayed in the room where he was 3 to 5 minutes or longer; that it was not over 10 minutes; and that it was at least 15 minutes after Martin came in before he heard the noise of the pistol shot. Thomas Feely, examined as a witness, testified that Martin came in 15 to 20 minutes past 11, and that he stayed in the room about 3 or 4 minutes, and then went to bed in the front room, three rooms from the kitchen, and while Martin was in the kitchen he heard a noise sounding like a cracker pistol. Annie Feely, the mother of Martin, was examined, and testified that he came into the house between a quarter and 20 minutes past 11, stayed in the kitchen 5 or 10 minutes, and then went into the front room where he slept; and that while Martin was in the bedroom the witness heard a noise, which was evidently that of the shot. Another witness, Catherine Gavin, who looked at the clock as did all the others, testified that Martin came in between 15 and 20 minutes past 11, and that Martin was in the kitchen sitting in a chair at the time of the shot, and he got up and went to his bed in the bedroom; and immediately afterwards she said, "At the time I heard the shot, Martin was in his bed." Michael Mahoney also testified that he was with the Feelys, McCormack, and Gillespie on the evening in question, and that Martin went into the house before the report of the pistol, and there was some other evidence tending to show that Martin did not go out. It is thus apparent that the witnesses who claimed to have been with Martin Feely at the time of the firing of the shot did not even agree with themselves as to his then location. The only thing that they appear to agree upon is the fact that they all looked at the clock, but did not see the time exactly the same. For some, the clock seems to have recorded between 15 and 20 minutes past 11; and for others, between 20 and 25 minutes past.

There is another feature of this evidence in regard to which a question arises, and that is, if Martin Feely came into the house 20 or 25 minutes past 11, and the shooting took place at a quarter to 12, what were John Feeley, the defendant, and the deceased doing during that 20 or 25 minutes? We have searched the case in vain to find any explanation as to what was done during that lapse of time. Furthermore, if the claim advanced upon the part of the defendant is correct, how does it happen that all the witnesses who saw the group immediately after the shooting agree that it was composed of four men, and

that no other men were in sight? If the statement made upon the part of the defense is true, such witnesses should either have seen three or five men. If they did not see the defendant and John Feely, then they would only have seen three, namely, the tall man, the short man, and the deceased. If they saw more than three, they must have seen five, for the defendant and Feely were together, and they could not have seen one without the other. All these witnesses agree that, upon looking immediately after hearing the shot, they saw four men in a group,—one of whom fell, one went up Second avenue, and two down. If the defendant and John Feeley were not of the group at the time of the shooting, and one of the group went up Second avenue, and one went down, what became of the third survivor? There is nobody that pretends to have seen him leave the scene of this tragedy. This condition of affairs can only be explained by conceding the truth of the evidence of Mamie Mahoney, that Martin Feely was there, and he went up Second avenue after the shooting, and the defendants and John Feely down. This view is corroborated to absolute conviction by the conduct of the defendant and John Feely. They made no outcry, and called for no assistance, and, when an outcry was raised, started into a run until they were stopped by the policeman, who, the defendant claimed, was asleep upon his post; the fact that these two men ran away the moment an outcry was raised being established by independent and undoubtedly reliable testimony. It would seem, therefore, that upon an examination of the salient features of this case, but one conclusion could be arrived at, which was that Gillespie was shot by either the defendant, Martin Feely, or John Feely, and that from the position which the three occupied to Gillespie, and the position and direction of the bullet wound, the shot must have come from the hand of the defendant.

A very large part of the appellant's brief is taken up by a criticism upon the charge of the learned recorder, and the claim that the case was not fairly presented to the jury. We have examined the charge, and do not find that the duty of the presiding officer was transgressed in any respect. It is entirely proper that the court should call the attention of the jury to the condition of the testimony, and to lay the facts before the jury in such a way that they may see the pertinency and tendency of the testimony, leaving them, of course, to draw the inferences therefrom; and this was all that was done upon the trial of this defendant. We think there was no reason shown for interfering with the verdict of the jury, and do not see, under the circumstances, how any other result could have been arrived at.

The judgment should be affirmed. All concur.